# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| BUTTONWOOD TREE VALUE PARTNERS, L.P., a California Limited Partnership, and MITCHELL PARTNERS L.P., a California Limited Partnership, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 9250-VCG |
| R. L. POLK & CO., INC., STEPHEN R. POLK (individually and on behalf of a Defendant Class of similarly situated persons), THE ESTATE OF NANCY K. POLK, KATHERINE POLK OSBORNE, DAVID COLE, RICK INATOME, CHARLES MCCLURE, J. MICHAEL MOORE, RLP & C HOLDING, INC., RLP MERGER CO., STOUT RISIUS ROSS, INC., and HONIGMAN MILLER SCHWARTZ AND COHN LLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: April 15, 2021
Date Decided: July 30, 2021

R. Bruce McNew, of COOCH AND TAYLOR, P.A., Wilmington, Delaware, *Attorney for Plaintiffs*.

David A. Dorey, of BLANK ROME LLP, Wilmington, Delaware; OF COUNSEL: Christopher M. Mason, of NIXON PEABODY LLP, New York, New York, and Carolyn G. Nussbaum, of NIXON PEABODY LLP, Rochester, New York, *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

In the twenty-odd years I have been a judicial officer in Chancery, the docket has moved in the direction of contractual disputes and what were once quaintly called alternative entity disputes. Those cases tend to require an intense focus on factual issues, which in turn makes discovery disputes a larger portion of the issues submitted for decision. That fact, coupled with the increased caseload in general, has led to an episodic use of Special Masters to advise the court in labor-intensive matters such as in-chambers document reviews. The employment of such Special Masters is, in my view, at times near-indispensable given the current litigation burden on the Court.

Special Masters are a blessing, but like all blessings in this imperfect world, mixed.[1] For litigants, there is a time and expense burden. For the Court, using Special Masters requires reviewing their findings *de novo*. This matter, while a traditional corporate equity matter, has posed unique and extensive discovery disputes that I referred to a Special Master; I must now pay the piper in the form of the following *de novo* review.

At issue is the thorough and thoughtful Final Report of the Special Master dated November 23, 2020. Both parties have taken limited exceptions to the Final Report. Upon review of the exceptions, I reach largely the same conclusions as did

---

[1] In the words of the great science-fiction philosopher Robert Heinlein, "There ain't no such thing as a free lunch." *See generally* Robert Heinlein, *The Moon is a Harsh Mistress* (1966).

the Special Master, with a single exception. As to matters in the Final Report to which no exception was taken, after a review *de novo* I adopt those portions of the Final Report as a decision of this Court.[2] My reasoning follows.

## I. BACKGROUND[3]

*A. The Parties and Relevant Non-Parties*

Non-party R. L. Polk and Co., Inc. ("Polk Co." or the "Company") is a Delaware corporation with its headquarters in Michigan.[4] The Company was formerly a named defendant; I dismissed it from this matter at Oral Argument on May 31, 2017.[5]

Defendant Stephen Polk ("Stephen")[6] is the great-grandson of the Company's founder and has been a member of the Company's Board of Directors (the "Board")

---

[2] The Final Report consists of a description of and application of law to hundreds of documents, privilege for which is disputed. They were individually reviewed by the Special Master, *in camera*. The tedium of such a review should not be underestimated, and I thank the Master for his service in this matter, which must have at times resembled the task that Thoreau earnestly urged be avoided; counting the cats in Zanzibar. I am also thankful, as should be the reader, that the nature of the exceptions allowed for a more categorical and less granular approach in this Memorandum Opinion.

[3] Unless otherwise noted, my description of the facts in this Background section is provided for context and does not reflect any binding factual determinations. Nor do I address the merits of any underlying claims in this dispute. My role is to review, *de novo*, the Special Master's conclusions with respect to privilege. Citations in the form JA __, SDM-__ are to the Joint Appendix submitted by the parties with the Defendants' Opening Brief in support of their exceptions to the Final Report. *See* Ex. to App. of Opening Br. in Supp. of Defs.' Notice of Exceptions to the Special Discovery Master's Final Report of November 23, 2020, Dkt. No. 272.

[4] *Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co., Inc.*, 2017 WL 3172722, at *1 (Del. Ch. July 24, 2017) [hereinafter *Buttonwood II*].

[5] *Id.*; *see also* Tr. of Oral Arg. on Defs.' Mots. to Dismiss and Partial Rulings 97:13–97:14, Dkt. No. 196.

[6] I refer to the Defendant by his first name, not out of any disrespect, but for the avoidance of confusion with other persons and entities discussed in this Memorandum Opinion. The Second

since 1984.[7]  At all times relevant to this action he was Chairman of the Board and the Company's Chief Executive Officer ("CEO") and President.[8]  Former defendant Nancy K. Polk is his sister-in-law and defendant Katherine Polk Osborne is his niece.[9]

The Estate of Nancy K. Polk was substituted in place of the deceased Nancy K. Polk ("Nancy") as a defendant in this action in 2019.[10]  Nancy was member of the Board at all times relevant to this matter.[11]

Defendant Katherine Polk Osborne ("Katherine") was a member of the Board at all times relevant to this matter.[12]

Non-party Honigman Miller Schwartz & Cohn LLP ("Honigman") is a law firm that served as outside counsel to the Company in connection with several of the transactions at issue in the Amended Complaint.[13]  Honigman was formerly a named

---

Amended Complaint (the "Amended Complaint") purports to name Stephen a defendant in his individual capacity and "on behalf of a Defendant Class of similarly situated persons."  Second Am. Verified Class Action Compl. 1, Dkt. No. 155 [hereinafter "Am. Compl."].  The Amended Complaint describes the alleged class as members of the Polk family who owned shares of the Company and "agreed to act as a block to exercise control over the Company."  Am. Compl. ¶ 15.  The Amended Complaint refers to this class as either the "Controlling Shareholders" or the "Polk Family Class."  *Id.*  No party has yet moved for class certification in this action.  Accordingly, for purposes of this Memorandum Opinion, the Plaintiffs and Defendants herein are such solely in their individual capacities and not on behalf any class.  *See generally* Ct. Ch. R. 23.

[7] *Buttonwood II*, 2017 WL 3172722, at *2.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] Order Substituting the Estate of Nancy K. Polk, Dkt. No. 240.
[11] *Buttonwood II*, 2017 WL 3172722, at *2
[12] *Id.*
[13] *Id.*; *see also* Aff. of Donald J. Kunz, Esq. Dkt. No. 257 [hereinafter "Kunz Aff."].

defendant in this action but was dismissed by my previous Memorandum Opinion of July 24, 2017.[14] The Plaintiffs allege that Honigman simultaneously served as counsel to the Company, to members of the Polk family, and to other entities affiliated with the Company or the Polk family.[15]

Plaintiff Buttonwood Tree Value Partners, L.P. ("Buttonwood") is a California limited partnership that held shares in the Company at all relevant times and participated in the 2011 Self-Tender, as defined below.[16] Plaintiff Mitchell Partners L.P. ("Mitchell") is also a California limited partnership that held shares in the Company at all relevant times and participated in the 2011 Self-Tender.[17] The Plaintiffs purport to bring this action on behalf of themselves and all others similarly situated.[18]

*B. Facts Leading to this Litigation*

In their Amended Complaint, the Plaintiffs allege that the Company's controlling stockholders—and specifically Stephen—breached their fiduciary duties to the minority by inducing them to sell their shares for an inadequate price in a self-tender transaction in 2011 (the "2011 Self-Tender") that enriched the Polk family at

---

[14] *Buttonwood II*, 2017 WL 3172722, at *9, *11 (Del. Ch. July 24, 2017).
[15] Am. Compl. ¶ 25, Dkt. No. 155.
[16] *Buttonwood II*, 2017 WL 3172722, at *1.
[17] *Id.*
[18] *Id.*

4

the Plaintiffs' expense.[19]  After the transaction, the purported controllers received dividends amounting to one-third of the self-tender price.[20]  The Company was later acquired for three times the self-tender valuation.[21]  In describing the self-tender to its stockholders, the Company allegedly failed to disclose several material facts, including that members of the Polk family had been considering a sale of the company for some time.[22]

### 1. The Company Explores its Options

In 2007 and 2008, the Board of Directors of Polk Co. (the "Board") considered, but did not proceed with, a potential share repurchase, or self-tender.[23] The parties do not dispute that Honigman advised the Company in connection with the contemplated self-tender.[24]  The Plaintiffs argue that the Defendants had a conflict of interest with respect to the transaction, which "was instigated at the request of the Polk family, and was structured to assure that the Polk family

---

[19] *Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co., Inc.*, 2018 WL 346036, at *1 (Del. Ch. Jan. 10, 2018) [hereinafter *Buttonwood III*].
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Special Discovery Master's Final Report and Recommendation after *In Camera* Review of Certain Documents Withheld on Grounds of Privilege 4, Dkt. No. 263 [hereinafter "Final Report"].
[24] *See, e.g.*, Pls.' Opening Br. in Supp. of their Exceptions to the Final Report 14, Dkt. No. 270 [hereinafter "Pls.' Opening Br."]; Br. in Opp'n to Pls.' Exceptions 4, Dkt. No. 274 [hereinafter "Defs.' Answering Br."].

maintained 90% control, preserving their ability to engage in a short-form merger with its attendant legal benefits."[25] This transaction never occurred, however.[26]

The Company again considered strategic transactions in 2010, including restructuring as a Subchapter S corporation, possibly via a short-form merger.[27] In connection with this potential transaction, the Company again sought the advice of Honigman.[28] Honigman also consulted with Delaware counsel, Morris Nichols Arsht & Tunnell LLP ("Morris Nichols").[29] The Plaintiffs characterize this transaction as another attempt by members of the Polk family to maintain their control of the Company.[30]

In November 2010, the Board appointed a sub-committee of directors that were not members of the Polk family (the "Special Committee") to evaluate this option further on the Company's behalf.[31] In December 2010, the Special Committee retained Morris Nichols to advise the Company. Shortly prior, Honigman also formed a shell entity, RLP&C Holding, Inc. ("Holding Co."), that

---

[25] Pls.' Opening Br. 5–6.

[26] Per the Defendants, economic events in 2008 caused the Company to change course. *See, e.g.*, Answer 36–37, Dkt. No. 202.

[27] Final Report 4.

[28] *Id.*

[29] *See, e.g., id.* 24.

[30] Pls.' Opening Br. 6 (noting that the "objective" of this transaction "was the elimination of all shareholders who were not Polk family members").

[31] Final Report 4. Per the Amended Complaint, the Company's ownership structure likely prevented it from electing Subchapter S status at this time, because it had more than 100 stockholders. However, "[o]ne way to reduce the number of shareholders in a corporation is to effectuate a short-form merger." Am. Compl. ¶ 52.

could serve as a holding company if the Company decided to pursue a short-form merger.[32] Honigman planned to represent Holding Co. if that proceeded.[33] However, no merger ever occurred.[34]

### 2. The 2011 Self-Tender

The Company ultimately completed the 2011 Self-Tender in March 2011.[35] Honigman again advised the Company in connection with the 2011 Self-Tender.[36] Per the Plaintiffs, the 2011 Self-Tender (like that contemplated in 2008) was instigated by Stephen to allow family members to sell their shares without sacrificing the family's control of the Company.[37]

### 3. The Sale of the Company

In June 2013, non-party IHS Inc. acquired all outstanding shares of the Company in a two-step merger.[38] In December 2012, the Board had declared what the Plaintiffs describe as "an extraordinarily high" special dividend.[39]

*C. This Litigation*

The Plaintiffs initiated this action in 2014, alleging breaches of fiduciary duty against officers and directors of the Company in connection with the 2011 Self-

---

[32] Final Report 4.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] Pls.' Opening Br. 6; *see also Buttonwood II*, 2017 WL 3172722, at *4 (Del. Ch. July 24, 2017).
[38] Final Report 4.
[39] *Buttonwood II*, 2017 WL 3172722, at *5 (quoting Am. Compl. ¶ 89).

Tender and the subsequent merger.[40]  The Plaintiffs have since amended the complaint twice, most recently on December 19, 2016.[41]

### 1. The Motion to Dismiss

My previous Memorandum Opinion of July 24, 2017 dismissed several defendants from the case, holding that the Amended Complaint stated claims against Stephen, Nancy, and Katherine for breaches of their fiduciary duties as directors and alleged controllers, but that it failed to state claims against the non-Polk-family directors, Honigman, or the Company's financial advisor.[42]

### 2. Evidentiary Disputes

The remaining Defendants, as well as former defendants Honigman and the Company, have withheld documents on the basis of privilege that the Plaintiffs challenge.[43]  My Letter Opinion of January 10, 2018 denied the Plaintiffs' Motion to Compel to the extent that it sought production of privileged documents and attorney work product based on the *Garner* and crime-fraud exceptions.[44]  I also directed the parties to meet and confer as to whether a Special Discovery Master should be appointed.[45]

---

[40] Verified Class Action Compl. for Breach of Fiduciary Duties, Dkt. No. 1.
[41] *See generally* Am. Compl.
[42] *Buttonwood II*, 2017 WL 3172722, at *6–11.  At oral argument on the Motions to Dismiss, I also dismissed the Company and two Polk-related entities from this action.
[43] *See generally, e.g.*, Pls.' Mot. to Compel, Dkt. No. 83.
[44] *Buttonwood III*, 2018 WL 346036, at *8 (Del. Ch. Jan. 10, 2018).
[45] *Id.*

### 3. The Special Master

My Order of April 9, 2018 appointed Mr. William B. Chandler, III as Special Discovery Master (the "Special Master") to address, among other issues in this action, any discovery disputes "as directed by the Court" or "as the Parties mutually agree to submit to the Special Master."[46]

#### a. Initial Findings

On December 11, 2018, the Special Master issued two final reports.[47] The Plaintiffs took exceptions to these reports, which were fully briefed and subsequently argued before me on August 6, 2019.[48] After that argument, I directed the parties to supplement their exceptions to address, *inter alia*, the Defendants' claims of privilege where Honigman purportedly represented parties with divergent interests in connection with the transactions at issue in the Amended Complaint.[49]

#### b. Remand

Having reviewed the parties' supplements, I denied the majority of the Plaintiffs' exceptions in my Bench Ruling of December 18, 2019 and in an order issued on December 27, 2019.[50] I also concluded that a document-by-document review was required to determine whether privilege applied to certain documents

---

[46] Order Appointing Special Discovery Master 2–3, Dkt. No. 208.
[47] Corrected Final Report on Pls.' Mot. to Compel Production of Documents, Dkt. No. 214; Final Report on Pls.' Mot. to Compel Discovery, Dkt. No. 215.
[48] *See generally* Tr. of Oral Arg. re Pls.' Exceptions, Dkt. No. 249.
[49] Tr. of Oral Arg. re Pls.' Exceptions 28, Dkt. No. 249.
[50] Order on Pls.' Exceptions, Dkt. No. 261.

prepared by Honigman. Accordingly, I directed the parties to confer on a proposal for presenting that issue to the Special Master.[51]

In light of my Bench Ruling, the parties requested that the Special Master make an *in camera* review of certain documents from the files of the Defendants, Honigman, and the Company to determine whether each was properly withheld, including (1) whether there had been a disclosure such that privilege was waived;[52] (2) whether the privilege log entries sufficiently identified counsel and counsel's role to justify the privilege claims; and (3) whether draft Board meeting minutes could be withheld where no final minutes had been produced.[53]

### c. *In Camera* Review

After conducting the requested *in camera* review, the Special Master issued a draft report on August 7, 2020 (the "Draft Report").[54] The parties briefed their exceptions to the Draft Report from September 1 through September 18, 2020.[55] The Special Master issued his Final Report and Recommendation after *In Camera* Review of Certain Documents Withheld on Grounds of Privilege (the "Final Report") on November 23, 2020.[56]

---

[51] Tr. of 12.18.19 Telephonic Rulings of the Court re Pls.' Exceptions 7:23–9:3, Dkt. No. 262.
[52] JA 10, SDM-0223.
[53] JA 11, SDM-0241.
[54] JA 8.
[55] *See generally* JA 1–7.
[56] *See generally* Final Report.

### 4. Recommendations of the Final Report

Of the 402 documents identified for *in camera* review, the Final Report recommends sustaining privilege as to thirty-five and permitting redactions based on partial privilege to another twenty-four.[57]

#### a. Draft Board Minutes and Presentations

With respect to draft board minutes and presentations, the Special Master concluded that the drafts must be produced where no finalized versions exist or are feasible to prepare. Accordingly, he recommended that draft minutes and resolutions are not privileged unless the finalized minutes are produced.[58]

#### b. Privilege Log Entries

With respect to privilege log entries, the Special Master recommended that documents, or markups or comments on documents, are privileged only if the privilege log identified that they were prepared by an attorney and not circulated externally (*e.g.*, to Stephen, a financial advisor, or another entity).[59]

#### c. Documents Relating to the Company's Consideration of a Stock Repurchase in 2008

The Special Master recommended no privilege for most of the documents relating to the Company's consideration of a stock repurchase in 2008.[60] In general,

---

[57] *See* Pls.' Opening Br. 2.
[58] Final Report 16.
[59] *Id.* 10–15, 17, 32, 34–36, 40.
[60] *Id.* 10–15.

11

Stephen's presence on emails was found to waive privilege as to those communications.[61] The Special Master concluded that Stephen stood opposite the Company with respect to the contemplated transaction and, therefore, privilege was waived by disclosure to him.[62]

> d. Documents Relating to the Company's Consideration of a Short-Form Merger to Convert to a Subchapter S Corporation in 2010 and Early 2011

Similarly, the Special Master recommended no privilege for most communications relating to the Company's exploration of potentially electing Subchapter S status in 2011.[63] Stephen's presence on emails was again recommended to waive privilege because "the Polk family and the Company stood on opposite sides of the contemplated transaction" and, therefore, "did not share a common interest in considering what a short-form merger transaction would entail."[64]

The Special Master also recommended that disclosure to Morris Nichols waive privilege once Morris Nichols began acting as counsel for the Special

---

[61] *E.g., id.* 12.
[62] *Id.* 11–12.
[63] *Id.*15–33.
[64] *E.g., id.* 17–18, 20.

Committee because the law firm would have negotiated with Honigman and Holding Co. in connection with that transaction.[65]

e. Documents Relating to the 2011 Self-Tender

The Final Report recommended no privilege for most of the documents relating to the 2011 Self-Tender.[66] However, and relevant here, the Special Master recommended sustaining privilege as to an email exchange reflecting the advice of Honigman and in-house counsel with respect to the Company's disclosure obligations under its bylaws.[67] Based on the content of the emails, the Special Master concluded that Stephen and the Company shared a common legal interest in the legal advice rendered therein.[68]

Also relevant here, because the Special Committee was not involved in the 2011 Self-Tender, the Special Master recommended that legal advice from Morris Nichols with respect to that transaction is privileged.[69]

---

[65] *See id.* 27, 29, 30. Prior to Morris Nichols representing the Special Committee, however, the Special Master did recommend privilege for portions of an email exchange between attorneys at Honigman and attorneys at Morris Nichols in which Honigman was seeking advice on behalf of the Company. *Id.* 24.
[66] *Id.* 33–39.
[67] *Id.* 33.
[68] *Id.* 33–34.
[69] *Id.* 37.

13

### f. Documents Relating to the Company's Sale in 2013

The Final Report recommended that the three documents relating to the 2013 Sale of the Company are not privileged, but with substantive comments on the draft Stock Purchase Agreement redacted.[70]

### g. The Plaintiffs' Exhibit

In their exceptions to the draft report, the Plaintiffs also identified eight documents not addressed in the Special Master's Draft Report. The Special Master determined that most of those documents had already been produced.[71] For those that had not, he recommended no privilege.

### 5. Procedural History

Both parties took exceptions to the Final Report.[72] They briefed those exceptions (the "Exceptions") from January 1 to February 22, 2021.[73] The Plaintiffs also moved to re-allocate the costs of the *in camera* review to the Defendants (the "Costs Motion").[74] On April 15, 2021, I heard argument on, and denied, the Costs

---

[70] *Id.* 40.

[71] *Id.* 40–41.

[72] Defs.' and R.L. Polk Co. Inc.'s Notice of Exceptions, Dkt. No. 264; Pls.' Notice of Exceptions, Dkt. No. 265.

[73] Pls.' Opening Br., Dkt. No. 270; Opening Br. in Supp. of Defs.' Exceptions, Dkt. No. 272 [hereinafter Defs.' Opening Br.]; Pls.' Br. in Opp'n to Defs.' Exceptions, Dkt. No. 273 [hereinafter Pls.' Answering Br.]; Defs.' Answering Br., Dkt. No. 274; Pls.' Reply Br., Dkt. No. 277; Reply Br. in Further Supp. of Defs.' Exceptions, Dkt. No. 278 [hereinafter Defs.' Reply Br.].

[74] Pls.' Mot. to Allocate Costs, Dkt. No. 271.

Motion and deemed both of the parties' exceptions fully submitted for decision without further argument as of that date.[75]

## II. LEGAL STANDARDS

### A. Standard of Review for Exceptions to a Master's Report

When exceptions are taken to a Master's final report, the Court of Chancery applies a *de novo* standard of review with respect to issues of both law and fact.[76]

### B. Attorney-Client Privilege

The attorney-client privilege is codified in Delaware Rule of Evidence 502, which provides in pertinent part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or [its] representative and the client's lawyer or [its] representative, (2) between the lawyer and the lawyer's representative, (3) by the client or [its] representative or [its] lawyer to a lawyer or a representative of the lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.[77]

---

[75] *See* Tr. of Oral Arg. and Rulings of the Court on Pls.' Mot. to Re-Allocate Costs 20, Dkt. No. 280.
[76] *See* Ct. Ch. R. 144(a); *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).
[77] D.R.E. 502(b).

15

## C. The Common Interest Doctrine

For the attorney-client privilege to attach, the communications between client and lawyer must be confidential.[78] Thus, disclosure of otherwise privileged communications to third parties can render them discoverable. However, there are circumstances in which parties are deemed to have a "common interest" such that communications within a group of individuals or entities are privileged.[79] The classic application of a common legal interest would be to "communications relating to the defense of a lawsuit among lawyers for codefendants."[80] Common legal interests can also exist with respect to a business transaction where the parties to a communication "have interests that are so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers."[81] The common interest must be *legal,* not commercial.[82] For example

---

[78] *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426, at *1 (Del. Ch. Mar. 20, 1986) ("[A]n essential condition for the successful invocation of the privilege is that the matter sought to be protected be confidential..").

[79] *See, e.g.*, *id.* at *2 (Del. Ch. Mar. 20, 1986) ("[W]here a client seeks legal advice as to the proper structuring of a corporate transaction and it is also prudent to seek professional guidance from an investment banker, it would hardly waive the lawyer-client privilege for a client to disclose facts at a meeting concerning such transaction at which both his lawyer and his investment banker were present.").

[80] *Id.*

[81] *Id.* at *1.

[82] *In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *4 (Del. Ch. July 3, 2013); *Glassman v. Crossfit, Inc.*, 2012 WL 4859125, at *3 (Del. Ch. Oct. 12, 2012) ("The common-interest doctrine does not protect communications between parties, or even between their attorneys, when those communications primarily concern 'a common commercial objective.' ") (quoting *Titan Inv. Fund II, L.P. v. Freedom Mortg. Corp.*, 2011 WL 532011, at *4 (Del. Super. Feb. 2, 2011)).

"communications about a business deal, even when the parties are seeking to structure a deal so as to avoid the threat of litigation, will generally not be privileged under the common interest doctrine."[83]

In the corporate context "[t]he attorney-client privilege finds full application."[84] In recognition of the reality that a corporation "may only assert the privilege through its agents, *i.e.*, its officers and directors,"[85] legal advice rendered to the corporation through one of its officers or directors is typically privileged as though given to a "joint client."[86] In other words, the officers and directors of a corporation share common legal interests with the corporation. This privilege is not absolute, however, "if the legal advice relates to a matter which becomes the subject of a suit by a shareholder against the corporation, the invocation of the privilege may be restricted or denied entirely."[87]

## III. ANALYSIS

The parties, in their respective Exceptions, dispute the scope of the common interest doctrine as applied to the documents at issue. The Defendants also take

---

[83] *Glassman*, 2012 WL 4859125, at *3–4.

[84] *Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993) (*citing UpJohn Co. v. United States*, 449 U.S. 383 (1981)).

[85] *Zirn v. VLI Corp.*, 621 A.2d at 781.

[86] *Kirby v. Kirby*, 1987 WL 14862, at *7 (Del. Ch. July 29, 1987). Although the *Kirby* Court described the directors as a "joint client," then-Vice Chancellor Jacobs later noted that "a more accurate description of the relationship is that there was a single "client," namely, the entire board, which includes all its members." *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1996 WL 307444, at *4 (Del. Ch. June 4, 1996); *accord Zirn v. VLI Corp.*, 621 A.2d at 781.

[87] *Zirn v. VLI Corp.*, 621 A.2d at 781.

17

exception to the Special Master's recommendation that privilege was waived by deficiencies in the privilege logs. I address each of these issues in turn below. For the reasons that follow, the Plaintiffs' Exceptions are denied, and the Defendants' Exceptions are denied in part and granted in part.[88]

*A. Common Interest*

The Plaintiffs' sole exception to the Final Report argues that the Special Master incorrectly recommended sustaining privilege, or partial privilege, for communications between parties who did not share a common legal interest in the following transactions: the contemplated stock repurchase in 2008; the contemplated election of Subchapter S status via short-form merger in 2010; and the completed 2011 Self-Tender. The Defendants' Exceptions focus on the same transactions, arguing the opposite. Per the Defendants, privilege was not waived because only parties with a common legal interest were included in the communications. Both set of Exceptions, to my mind, raise the same issue: whether the confidentiality, and, therefore, the attorney-client privilege that would otherwise apply to the withheld communications, was fatally compromised by the presence of individuals or entities whose interests were insufficiently "parallel and non-adverse" with respect to the

---

[88] In taking exceptions to the Final Report, the parties have not submitted the documents implicated by their respective Exceptions for my own *in camera* review; nor do I consider such review necessary. I understand my task here to be limited to providing the correct parameters for application of the privilege. In rendering my decision below, I have considered the Final Report and the briefing and evidence submitted by the parties, including in their Joint Appendix. *See, e.g.*, App. to Defs.' Opening Br., Dkt. No. 272; Ex. to App. to Defs.' Opening Br., Dkt. No. 272.

18

particular transaction to sustain the common interest doctrine. Accordingly, I address these Exceptions together. I follow the Special Master and the parties in organizing the Exceptions by the transaction to which the contested communications pertain. For each transaction, I consider separately whether the relevant persons or entities share a common legal interest such that privilege is not waived.

### 1. Documents Relating to a Possible Self-Tender in 2008

#### a. Stephen Polk

Regarding a possible self-tender by the Company in 2008, the Final Report recommends waiving attorney-client privilege where Stephen was included in the communications.[89] The Special Master concluded that Stephen "stood on both sides of the contemplated transaction, including opposite the Company."[90] Therefore, he did not share a common interest with the Company and privilege was waived as to those communications as though they were disclosed to a third-party. The Defendants take exception to this recommendation, contending that, at the pleading stage, mere allegations of a conflict of interest are insufficient to waive attorney-client privilege as to the Company's directors and officers.[91]

---

[89] Final Report 11–12.

[90] *Id.*

[91] The Defendants note that the Special Master's Draft Report recommended privilege as to these communications and, therefore, they did not previously have the opportunity to take exception to this recommendation. Defs.' Opening Br. 2; *see also* JA 9. Given that the Defendants could not have taken exception to a recommendation that was not in the Draft Report, I consider this exception to be properly before me here. Ct. Ch. R. 144(b).

I note that, where a fiduciary is alleged to have interests that conflict with those of the corporation, a stockholder typically attempts to gain access to the corporation's attorney-client communications by showing "good cause" under the standards set forth in *Garner v. Wolfinbarger*.[92] This exception is not, to my mind, raised here, however. The parties do not appear to dispute whether there is good cause to apply an exception to attorney-client privilege, but the more fundamental question of whether the communications were properly designated as privileged in the first place.[93]

"The party attempting to withhold discovery bears the burden of showing that the communications fall within the scope of the common-interest doctrine."[94] In the transactional context, the attorney-client privilege will not attach to communications shared with transactional counterparties unless the parties "have interests that are so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers."[95] Here, Stephen is the Company's

---

[92] 430 F.2d 1093, 1104 (5th Cir. 1970) *cert. denied*, 401 U.S. 874 (1971). My previous Letter Opinion denying the Plaintiffs' Motion to Compel provides a more robust discussion of *Garner* in the context of this case. *See generally Buttonwood III*, 2018 WL 346036 (Del. Ch. Jan. 10, 2018).

[93] The Defendants argue that *Deutsch v. Cogan*, 580 A.2d 100 (Del. Ch. 1990), warrants sustaining privilege because, in that case, the Court considered whether *Garner* applied without first considering whether privilege had been waived by disclosure beyond the circle of confidentiality. Defs.' Opening Br. 9. In *Deutsch*, the parties conceded that the communications were privileged and it does not appear that the common-interest doctrine was invoked. *See, e.g.*, *Deutsch v. Cogan*, 580 A.2d at 104. Accordingly, *Deutsch* does not apply here.

[94] *In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *4 (Del. Ch. July 3, 2013); *see also Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992); *Glassman v. Crossfit, Inc.*, 2012 WL 4859125, at *2 (Del. Ch. Oct. 12, 2012).

[95] *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426 at *1 (Del. Ch. Mar. 20, 1986).

Chairman, CEO, and President, as well as a stockholder who, per the Defendants, planned to participate in the stock repurchase.[96] I have also found it reasonably conceivable that Stephen acted as a controller to use the Company for the Polk family's benefit.[97] The Defendants contend that the Polk family would not be negotiating opposite the Company in the context of a self-tender.[98] They concede that the Company would be on one side as buyer and all shareholders—including, necessarily the Polk family—"would potentially be on the other side as sellers."[99] They dispute, however, that the Polk family's interests would diverge from those of the minority. I make no finding here that Stephen, or the other Defendants, did control the Company for the benefit of the Polk family, nor is such a finding necessary. Rather, the reasonable conceivability that they did, without, at this stage, evidence to the contrary, prevents me from concluding that Stephen's legal interests were "so parallel and non-adverse" to those of the Company that "they may be regarded as acting as joint venturers" with respect to the stock repurchase contemplated in 2008.[100] This is the Defendants' burden; it has gone unmet here.

The Defendants argue that this conclusion posits a new general rule, at odds with our case law, that the attorney-client privilege can be vitiated whenever an

---

[96] *See, e.g.*, Defs.' Answering Br. 5.
[97] *See generally Buttonwood II*, 2017 WL 3172722 (Del. Ch. July 24, 2017).
[98] Defs.' Answering Br. 8–9.
[99] *Id.* 9 n.19.
[100] *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426 at *1 (Del. Ch. Mar. 20, 1986).

executive is "merely" alleged to have control.[101] I agree that that fact alone would be insufficient to prevent privilege from attaching, and I do not hold that there can never be privilege in the case of an otherwise-privileged document shared with an alleged controller. The allegations here go beyond control, however. The Plaintiffs allege facts that indicate that Stephen pursued the transaction for the benefit of the controlling Polk-family stockholders. The scope of the privilege ordinarily applied to corporate insiders can be limited where the party objecting to discovery fails to demonstrate a common legal interest.[102] The Defendants here have failed to demonstrate a common legal interest between Stephen and the Company with respect to the stock repurchase contemplated in 2008 for the reasons already stated. Thus, the Defendants have not met their burden to establish that the relevant communications are privileged. The Defendants' Exceptions to this recommendation of the Final Report are denied.

---

[101] Defs.' Answering Br. 7–8. They also note that "no case we have found has ever held that (a) an attorney-client communication that (b) includes both a company and a CEO who is alleged to be a controlling shareholder about (c) a transaction such as a self-tender is not privileged because of alleged control, particularly where the only evidence offered is the communication and the plaintiffs' allegations." *Id.* at 7–8.

[102] *Cf. Zirn v. VLI Corp.*, 621 A.2d at 781; *In re Teleglobe Communications Corp. v. BCE Inc.*, 593 F.3d 345, 373 (3d Cir. 2007) (noting, in the context of a parent spinning off a subsidiary, that "once the parties' interests become sufficiently adverse that the parent does not want future controllers of the subsidiary to be able to invade the parent's privilege, it should end any joint representation on the matter of the relevant transaction.").

### b. Honigman

The Final Report recommended that portions of communications including Honigman could be redacted on the basis of attorney-client privilege, because Honigman advised the Company in connection with the stock repurchase contemplated in 2008.[103] The Plaintiffs took exception to the recommended redactions because, per the Plaintiffs, "Honigman simultaneously represented the Polk family and the Company during communications regarding this conflicted 2008 self-tender."[104] The Defendants deny that Honigman represented anyone other than the Company in connection with that transaction.

Where one lawyer represents multiple parties to a transaction the common legal interest must exist among all clients for privilege to attach.[105] I have already found that Stephen did not share a sufficient common legal interest with the Company in connection with this transaction to sustain privilege for his communications with the Company's counsel. The same conclusion would necessarily apply to the other members of the alleged control group, the Polk family. If Honigman advised both the Polk family and the Company in connection with the

---

[103] Final Report 11–13.

[104] Pls.' Opening Br. 14.

[105] *Cf. In re Lululemon Athletica, Inc. 220 Litig.*, 2015 WL 1957196 at *9 (Del. Ch. Apr. 30, 2015) (privilege was proper for founder and chairman's communications with in-house counsel to coordinate a company statement about allegedly improper trades).

contemplated stock repurchase, privilege would be waived as to communications with Honigman as though they were disclosed to a third-party.

The Plaintiffs offer nothing to support their assertion that Honigman represented members of the Polk Family in connection with this transaction, however. The Defendants, for their part, actively deny it. I cannot, on the basis of such a sparse record, find that Honigman advised the Polk family such that the Polk family's alleged conflict of interest vitiates the otherwise applicable attorney-client privilege. The Plaintiffs' Exception to this recommendation is denied.

2. Documents Relating to Taking the Company Private or Converting to a Subchapter S Corporation

a. Stephen Polk

As with respect to the transaction considered in 2008, the Special Master recommended that privilege was waived where Stephen was included in communications about the Company's potential election of Subchapter S status via short-form merger because "the Polk family and the Company stood on opposite sides of the contemplated transaction [and] . . . did not share a common interest in considering what a short-form merger transaction would entail."[106] The Defendants argue that this conclusion is flawed because management, including Stephen, "needed to take certain preliminary steps"; "reasonabl[y] . . . expect[ed] expect that

---

[106] Final Report 17.

24

their communications with the Company's lawyers were and would remain privileged and confidential"; and "there was no adversity" between Stephen and the Company.[107]

As previously stated, the presence of conflicted corporate insiders may render communications between the corporation and its counsel discoverable, just as would disclosure to any third-party lacking a common legal interest. The status of Stephen and those he communicated with as corporate officers does not change the analysis at this stage of the inquiry. As a significant stockholder, Stephen had a material financial interest which would be affected by a merger or a change in the Company's tax status. I have also found it reasonably conceivable that Stephen controlled the Company for the benefit of the Polk family. Thus, the Defendants have not met their burden to demonstrate that Stephen shared a common legal interest with the Company or its counsel in connection with the potential Subchapter S election and communications cannot be withheld on that basis. The Defendants' Exception to this recommendation is denied.

### b. Honigman

With respect to the same transaction, the Final Report recommended that certain communications including Honigman could be withheld or redacted on the basis of attorney-client privilege. The Plaintiffs argue that communications

---

[107] Defs.' Opening Br. 11–12.

including Honigman are not privileged, repeating their allegation that Honigman simultaneously represented the Polk family and the Company.[108]

If counsel simultaneously represents two parties to the same transaction who do not share a common legal interest, privilege does not attach. For example, in *Jedwab*, the Court was unsatisfied with the assertion that "all parties to the merger have an interest in seeing the transaction effectuated" and found no common interest for documents prepared by two companies in the course of negotiating a merger transaction.[109] Instead, the Court examined "the functions [the lawyers] were performing when the documents sought were prepared," concluding that they "obviously represented clients with adverse interests."[110] Similarly, in *Zirn v. VLI Corp.*, the Court held that documents regarding efforts to reinstate a lapsed patent on whose reinstatement a merger was conditioned "were not privileged as a matter of 'common interest' because the interests of the two companies, were not 'so parallel and non-adverse that . . . they may be regarded as acting as joint venturers.'"[111]

In their Amended Complaint, the Plaintiffs allege that the "issue of Subchapter S status was, all along, a ruse to justify a transaction to eliminate

---

[108] Pls.' Opening Br. 14–17.
[109] *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426, at *1 (Del. Ch. Mar. 20, 1986).
[110] *Id.* at *2.
[111] 1990 WL at 119685, at *8 (Del. Ch. Aug. 13, 1990) (quoting *Jedwab*, 1986 WL 3426, at *2).

minority shareholders."[112] In seeking to vitiate the attorney-client privilege, the Plaintiffs assert that Holding Co. was the Polk family's "going private acquisition vehicle."[113] Thus, per the Plaintiffs, any representation of Holding Co. by Honigman was representation of the Polk family and should waive privilege for the same reasons joint representation of the Polk family would.

The Defendants, for their part, deny that Honigman represented the Polk family in connection with this transaction. Although the Defendants appear to concede that Honigman represented both the Company and Holding Co. "at some point," they dispute these entities lacked a common legal interest.[114] Per the Defendants, Holding Co. was only formed as a prefatory step and never engaged in substantive discussion of deal terms with the Company.[115] In other words, Holding Co. was essentially a subsidiary of the Company and shared its legal interests. Additionally, they submit that any dual representation by Honigman ceased before any adversity of interest could have developed.[116] At that point, Morris Nichols would have represented the Company and Honigman would have represented only Holding Co.[117]

---

[112] Am. Compl. ¶ 55.
[113] Pls.' Opening Br. 8.
[114] Defs.' Answering Br. 11.
[115] Defs.' Opening Br. 6; Defs.' Answering Br. 6–7.
[116] *E.g.*, Defs.' Opening Br. 6, 11–12.
[117] *See id.*

It is undisputed that Honigman advised the Company in connection with its exploration of converting to a Subchapter S corporation, possibly via short-form merger in 2010.[118]  In connection with that same transaction, Honigman also formed Holding Co.[119]  The Plaintiffs offer no evidence to support the allegation that Holding Co. was formed on behalf of the Polk family, rather than the Company. Honigman's affidavit implies that Holding Co. was formed as part of Honigman's representation of the Company.[120]  Accordingly, I do not find that privilege is waived based on Honigman's alleged dual representation of both the Polk family and the Company.

If a short-form merger had proceeded, Honigman planned to represent Holding Co. in negotiations with the Special Committee, which was represented by Morris Nichols.[121]  Honigman most likely represented both the Company and Holding Co. from November to December 2010.[122]  The Defendants and Honigman submit that Honigman only performed certain preliminary tasks on the Company's behalf and that Holding Co. never made any merger proposal.[123]  This transaction itself never occurred.

---

[118] *See* Pls.' Opening Br. 9; Defs.' Answering Br. 6; Kunz Aff. ¶¶ 4–5.
[119] Kunz Aff. ¶ 5.
[120] *Id.* ¶¶ 4–5.
[121] Final Report 4.
[122] *See, e.g.*, Pls.' Opening Br. 10; Defs.' Answering Br. 6.
[123] Kunz Aff. ¶¶ 6, 11–12.

A waiver of privilege occurs when the parties' interests become adverse.[124] I do not assume that Holding Co. became adverse to the Company at the moment of its formation merely because it might at some later point negotiate opposite the Company in a merger. It does not appear that the parties ever negotiated terms. Accordingly, I do not find that Honigman represented clients with adverse interests.

The Exceptions to this recommendations are denied.

### c. Morris Nichols

The Plaintiffs also take exception to the Final Report's recommendation that certain advice of Morris Nichols could be redacted as attorney-client privilege, because Morris Nichols ultimately represented the Special Committee. Honigman appears to have consulted with Morris Nichols on matters of Delaware law prior to Morris Nichols representing the Special Committee.[125] That advice was rendered to the Company and is therefore properly privileged.[126] The Exceptions to this recommendation are denied.

---

[124] *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426, at *2 (Del. Ch. Mar. 20, 1986); *accord Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Servs. of Cincinnati, Inc.*, 1995 WL 347799, at *2 (Del. Ch. May 17, 1995) (holding that an employee's communications with corporate in-house counsel were not privileged with respect to negotiating the employment contract because the employee had "moved across the table" and become adversarial).
[125] *See, e.g.*, JA 13, SDM-0257.
[126] *In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *4–5 (Del. Ch. July 3, 2013) (finding that the special committee, the rest of the board, and the company's financial advisor shared a common legal interest with respect to the legal risks of a contemplated transaction); *cf. Jedwab*, 1986 WL 3426, at *2.

### 3. Documents Relating to the 2011 Self-Tender

#### a. Stephen Polk

In general, the Final Report again recommended no privilege where legal advice was shared with Stephen when he "stood on opposite sides of the transaction."[127]  However, privilege was recommended as to several communications including Stephen that reflected legal advice about the Company's disclosure obligations under its bylaws in anticipation of a shareholders meeting.[128] The Special Master concluded that Stephen had a common interest with—and was, therefore, not adverse to—the Company with respect to its disclosure obligations under the bylaws.[129]

The Plaintiffs took exception to this recommendation, arguing that "[t]he acknowledged adversity of interests and the absence of a binding contract until the Company accepted the [2011 Self-Tender]" precluded any common legal interest as to the content of the disclosures or the timing of the issuance of the offer.  The Defendants, for their part, reiterate their general exception that privilege cannot be waived by disclosure to Stephen based on breaches of fiduciary duty that are only alleged at this stage.[130]

---

[127] Final Report 38.
[128] *Id.* 33.
[129] *Id.* 33–34.
[130] *E.g., id.* 8–9.

30

When determining whether parties to a transaction share a common interest the Court must examine "the functions [the lawyers] were performing when the documents sought were prepared."[131] The presence or absence of a binding contract is not dispositive of whether a common interest exists.[132] Two of the documents to which the Plaintiffs' exception would apply are identified in the privilege logs as emails "containing legal advice concerning corporate bylaws of [the Company] and requirements for notice of shareholder meeting."[133] The other two are identified as emails "containing legal advice concerning discussion of a self-tender at an annual shareholder meeting."[134] Unlike the documents that I have found are not privileged due to being shared with Stephen, it does not appear that these documents reflect legal advice that implicates Stephen's conflicted position with respect to a self-tender. They do not appear to contain legal advice about the terms or timing of the 2011 Self-Tender or the content of disclosures related to it. However, as the Special Master noted, the privilege log description could have better "reflected the nature of the legal advice being conveyed." The Defendants should update the privilege log,

---

[131] *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426, at *2 (Del. Ch. Mar. 20, 1986).

[132] *Cf. id.* The Plaintiffs cite *Jedwab* in support of their theory that no alignment of interest exists prior to entering a binding contract. Pls.' Opening Br. 13; Pls.' Answering Br. 7. In *Jedwab*, the party asserting the privilege argued that parties negotiating a merger had a common legal interest in seeing the transaction effectuated. *Jedwab*, 1986 WL 3426, at *2. The Court concluded that the claim of privilege was ill-founded based on a fact-specific inquiry into the roles the lawyers were performing, rather than a general rule that the absence of a binding contract precludes a finding of common interest. *Id.*

[133] JA 13, SDM-0278, SDM-0301.

[134] JA 13, SDM-0313.

31

but this flaw is not so egregious to warrant waiving privilege as to the entirety of the communications. The Plaintiffs' Exceptions to this recommendation are denied.

### b. Honigman

With respect to the 2011 Self-Tender, the Plaintiffs reiterate their general exception that communications including Honigman are not privileged "due to Honigman's dual roles."[135] Again they provide no evidence that Honigman represented anyone other than the Company in connection with this transaction. Accordingly, and for the same reasons already discussed with respect to the previous transactions, I cannot conclude that privilege was waived. The Plaintiffs' Exceptions to this recommendation are denied.

### c. Morris Nichols

The Plaintiffs also reiterate their exception that legal advice of Morris Nichols is not privileged, because Morris Nichols represented the Special Committee, "not the Company," in connection with the 2011 Self-Tender.[136] Although Morris Nichols was retained to negotiate on behalf of the Special Committee in connection with the Company's contemplation of a short-form merger in 2010, there is no evidence to suggest that a special committee was used in connection with the 2011 Self-Tender or that Morris Nichols continued to advise the Special Committee once

---

[135] Pls.' Opening Br. 18–19.
[136] *Id.* 18.

a merger was no longer being considered. Even if the Special Committee was still constituted and advised by Morris Nichols at this time, the Special Committee, the Company, and—absent other adversity—the entire Board would share a common legal interest in advice related to a self-tender.[137] Accordingly, legal advice rendered by Morris Nichols to the Company is privileged. The Plaintiffs' Exceptions to this recommendation are denied.

*B. Privilege Log Entries*

I agree with the Special Master's conclusion in the Final Report that the privilege logs are deficient.[138] Additionally, as the Defendants themselves point out, they did not take exception to that conclusion which was present in the Draft Report, as well.[139] However, the Defendants chose to await my final determination before turning to the necessary corrections to the logs. The question is whether that languid approach amounts to a waiver of the privilege. The Special Master recommended that a waiver is warranted under these circumstances. That is certainly defensible

---

[137] *See In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *5 (Del. Ch. July 3, 2013) (finding that the special committee and the rest of the board shared a common legal interest with respect to the legal risks of a contemplated transaction).

[138] *See* Final Report 10–15, 17, 32, 34–36, 40. Failure to identify in the privilege log that the document was prepared by an attorney or reflects legal advice of an attorney can result in waiver of the privilege. *See, e.g., Mechel Bluestone, Inc. v. James C. Justice Companies, Inc.*, 2014 WL 7011195, at *5–6 (Del. Ch. Dec. 12, 2014) ("If a party fails to provide an adequate description for a document, then the privilege for that document may be deemed waived.").

[139] *See* Ct. Ch. R. 144(b).

given the Defendants' generally lethargic response to their discovery obligations.[140] The withholding of corrections to the log in the context of a proceeding subject to *de novo* review does not, to my mind, warrant a waiver of privilege, however, which would entail an intentional relinquishment of rights. The Defendants should have acted with alacrity, but I do not find a waiver. The Defendants shall make the corrections identified in the Final Report within 15 days after entry of an order implementing the rulings in this Memorandum Opinion, after which the discovery rulings adopted here from the Final Report shall apply to those documents. To the extent that my conclusion conflicts with the Final Report, the Defendants' Exceptions are granted.

## IV. CONCLUSION

The Plaintiffs' Exceptions are denied, and the Defendants' Exceptions are denied in part and granted in part. The parties should meet and confer as to a case schedule and provide an appropriate form of order that includes deadlines by which the Defendants shall provide corrected privilege logs and produce documents in accordance with the conclusions of the Final Report and this Memorandum Opinion.

---

[140] Where a party is on notice of obvious deficiencies in their privilege log and does not correct them after ample opportunity to do so, privilege can be waived. *See Mechel Bluestone*, 2014 WL 7011195, at *5–6. The Defendants have been on notice of potential deficiencies in their privilege log entries since at least 2018. *See Buttonwood III* at 2018 WL 346036, at *1, *8 (Del. Ch. Jan. 10, 2018) (noting the purported deficiencies).